UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
TRACEY BOYCE, *pro se*,                                    :
                                                          :
                              Petitioner,                 :
                                                          :          **OPINION AND ORDER**
              -against-                                    :          09-cv-2832 (DLI)
                                                          :
MARK L. BRADT, Superintendent,                            :
Elmira Correctional Facility,                             :
                                                          :
                              Respondent.                 :
--------------------------------------------------------------x
**DORA L. IRIZARRY, United States District Judge:**

*Pro se* petitioner Tracey Boyce ("Petitioner") is currently serving concurrent prison

sentences of 25 years to life and 15 years, following his conviction in New York State Supreme

Court, Kings County, for murder in the second degree, N.Y. Penal Law § 125.25(1), and criminal

possession of a weapon in the second degree, N.Y. Penal Law § 265.03(2).   In this petition for a

writ of habeas corpus pursuant to 28 U.S.C. § 2254, Petitioner claims that:  (1) the prosecution

failed to prove that he knowingly, intelligently and voluntarily waived his *Miranda* rights when

he made certain inculpatory statements to police officers, and (2) his sentence was harsh and

excessive.  For the reasons set forth below, the petition is denied in its entirety.

I.      **BACKGROUND**

        A.      **Murder of James Green**

        Around 1990, James Green ("Green") and his brother Milton Green formed a music

production company.  (Green 297-98.)[1]   The music studio was located in the first floor of a

_____
[1] The Background is largely taken from testimony given in the hearing held by the trial court on
Petitioner's motion to suppress statements he gave to the authorities and in Petitioner's trial.
Names in parentheses refer to the last name of the witnesses whose testimony is being cited.
Where the name is preceded by "H", the citation is to the suppression hearing.  Where the name
is not preceded by "H", the citation is to the trial transcript.  The transcripts of the suppression

building in Brooklyn, while the other floors of the building contained apartments. (Green 289-90.) At some point in the early 1990s, Green recruited Petitioner to record in his studio and, eventually, Petitioner began living rent-free in the basement below the studio. (Green 290-92.) However, by at least the later part of 2002, Green began to demand that Petitioner pay $150 per month in rent, because Petitioner's girlfriend, Theresa DeWindt, and her children had started living with Petitioner in the basement. (DeWindt 453.) According to Petitioner's girlfriend, Petitioner would promise Green that he would pay the rent and then not pay it. (DeWindt 454.)

During the morning of May 15, 2003, Green asked Petitioner for rent money, and Petitioner responded that he would pay. (DeWindt 455-56.) He told DeWindt later in private that he actually had no intention of paying the rent money. (*Id.*) On the evening of May 15, 2003, a witness recalled that he saw Petitioner angrily call Green out of the studio, and when Green returned to the studio after leaving to talk to Petitioner, Green looked upset. (Richards 352-53, 356-59.) The same evening, Petitioner's friend Daniel McKay visited Petitioner in his basement apartment. (McKay 586-87.) While they were in the basement, Petitioner asked McKay, "Do you want to kill somebody?" (*Id.*) McKay asked who Petitioner wanted killed and Petitioner responded "Country," which was Green's nickname. (McKay 587.) Petitioner told McKay that he wanted to kill Green because Green had been complaining about money Petitioner owed him for rent and studio time. (McKay 587-88.) McKay did not believe that Petitioner was serious about killing Green. (McKay 600.) McKay stayed at Petitioner's apartment until about 2:00 a.m. on May 16, 2003. (McKay 589.)

At approximately 2:00 p.m. on May 16, 2003, Petitioner telephoned DeWindt and told her to come to his apartment immediately. (DeWindt 457.) DeWindt asked Petitioner what was

hearing, trial and sentencing are attached as Exhibit 1 to the Affidavit of Victor Barall, Docket Entry 3.

wrong and Petitioner told her that he killed "him." (*Id*.) DeWindt arrived at Petitioner's apartment approximately 30 to 45 minutes later and found Petitioner sitting on his bed smoking, with a gun in his waistband and a shotgun by the doorway. (DeWindt 458-59.) Petitioner apologized to DeWindt for messing up her life. (DeWindt 459.) When DeWindt asked Petitioner why he was upset, Petitioner said that he had gone upstairs to talk to Green and the discussion turned into an argument. (*Id*.) Petitioner told DeWindt that the argument became a fight and the only way to get Green off of Petitioner was to shoot Green, so Petitioner shot him. (DeWindt 459-60.) Petitioner also told DeWindt that after shooting Green, he had gone to the basement to get a shotgun and "finish him off," but Petitioner did not tell DeWindt whether he had actually done so. (DeWindt 460.)

Before DeWindt arrived, Petitioner also telephoned his friend Lenrich Prescod and asked him to come to Petitioner's apartment to help Petitioner move some things. (Prescod 531-33.) McKay testified that he saw Prescod on his way to Petitioner's apartment and decided to join him. (McKay 589.) They reached the building together sometime after 5:00 p.m. (McKay 589-90.) Shortly before Prescod and McKay arrived, a recording engineer, David Downie, came to the studio to begin setting up for a recording session scheduled for that night, and ran into Petitioner in the hallway outside the studio. (Downie 308-10.) Petitioner appeared angry and told Downie not to enter the lounge that leads to the studio, "or else." (Downie 310.) Petitioner then lifted up his shirt and revealed that he had a gun. (Downie 311.) Petitioner said to Downie that, if he told anybody that he saw Petitioner in the building, "it was going to be trouble" for Downie's family and friends. (Downie 312.) Around the time that Petitioner was showing Downie the gun, McKay and Prescod arrived and Petitioner let Downie leave the building. (Downie 311-15; McKay 592.)

Prescod, McKay and DeWindt began to move Petitioner's and DeWindt's belongings from the basement to the outside of the building soon after Prescod and McKay arrived. (DeWindt 463; Prescod 533-34; McKay 590-91.) While they were moving the belongings, Petitioner told McKay and Prescod that Petitioner had an argument with Green and then shot him. (Prescod 534, 539; McKay 592-93, 595.) Petitioner also asked McKay if he wanted to see Green's body, but McKay said no. (McKay 593.) While moving, either DeWindt or McKay called two cabs and, once the cabs arrived, they loaded the belongings into the cabs. (DeWindt 463-64; McKay 592.) Petitioner, McKay, DeWindt and Prescod then took the cabs to the apartment of Petitioner's friend Rohan and unloaded the belongings there. (DeWindt 464; Prescod 536; McKay 593-94.)

Meanwhile, after Downie left the studio, he went home, where he met Lloyd Richards, one of Green's friends, as well as a number of Richards' other friends. (Downie 316-17; Richards 350.) The group went back to the studio at approximately 6:30 p.m. and entered the lounge and control areas of the studio. (Downie 318-20; Richards 350-51.) As they entered the room, Downie and Richards saw Green kneeling over a chair, like he was looking for something on the floor or was sick. (Downie 318-20; Richards 350-52.) Downie began talking to Green, but when Green did not answer, Downie touched Green's back and felt that it was cold. (Downie 320.) Richards also touched Green and felt that he had no pulse, and saw that Green had blood on his stomach. (Downie 320; Richards 352.) Downie then called 911. (Downie 320.) The police came to the studio, found Green's body and examined the scene. (Downie 321; Duffy 369-75.)

After speaking with witnesses, the detective assigned to the case, Detective Duffy, focused on Petitioner as a suspect in Green's death. (Duffy 376.) However, Duffy was unable to

locate Petitioner through various means and, at the suggestion of Green's brother, Duffy ultimately contacted the television program "America's Most Wanted." (Duffy 377-82.) The program broadcast a segment on Green's killing on May 1, 2004. (Duffy 382.) Paul Holland, a detective in Boca Raton, Florida, watched the program and recognized Petitioner as somebody he knew. (Duffy 385.) Holland and a team of local officers immediately began searching for Petitioner. (Duffy 384-85.) That same day, the officers found Petitioner and arrested him. (Duffy 385.)

### B. Interrogation of Petitioner

On May 2, 2004, when a fingerprint comparison confirmed that the man Officer Holland had arrested was indeed Petitioner, Duffy and his partner, Detective Kristofferson, flew to Florida. (Duffy 386.) At approximately 2:00 p.m., local officers led Duffy and Kristofferson into an interview room, where Petitioner was seated and handcuffed. (H: Duffy 11-12.) The detectives introduced themselves to Petitioner and asked whether Petitioner would be willing to talk to them. (H: Duffy 11.) Duffy then read Petitioner his *Miranda* rights from a sheet of paper. (H: Duffy 12.) After each warning, Duffy asked Petitioner if he understood and Petitioner responded, "Yes." (H: Duffy 14.) Petitioner did not ask any questions about the warnings. (H: Duffy 29.) When Duffy was finished reading all of the *Miranda* warnings, Duffy asked Petitioner whether he was willing to answer questions. (H: Duffy 14.) Petitioner responded that he was indeed willing to answer questions. (*Id.*)

Duffy began the interview by asking Petitioner for his name. (H: Duffy 17.) Petitioner responded that he did not have a name anymore and that he only answered to a higher power. (*Id.*) Petitioner said that before he accepted this higher power, his name was Tracey Boyce. (*Id.*) Petitioner also explained that, from as far back as he could remember, he was never the same as

everybody else. (*Id.*) Although he generally got along with everybody, there were five people in his life that pushed him to a point that he never wanted to be. (*Id.*) Petitioner claimed that these five people knew what buttons to push to get him to the point where he wanted them to be dead. (*Id.*) Petitioner hated feeling that way, but when those people pushed him, Petitioner did not have a choice. (*Id.*)

Petitioner explained that Green got Petitioner to "that point" because Green put his hands on Petitioner. (H: Duffy 17-18.) According to Petitioner, Green kept complaining about Petitioner's failure to pay rent money. (*Id.*) Petitioner said he left for a while and went to Philadelphia, but as soon as he returned to Brooklyn, Green again started bothering Petitioner for rent money. (*Id.*) The day after Petitioner returned to Brooklyn, Green called Petitioner into the recording studio. (*Id.*) Petitioner stated that Green, who was sitting in a chair and playing with a television remote control, was talking to Petitioner like he was a "loser." (*Id.*) Then, Petitioner explained, Green got up from the chair and attacked Petitioner, put both hands around Petitioner's neck and began laughing. (H: Duffy 18-19.) Petitioner said that he was unable to get Green off of him and remembered that he had a gun in his waistband. (*Id.*) Petitioner told Duffy that he then pulled out the gun and shot Green in the stomach. (*Id.*)

According to Petitioner, Green then let go of Petitioner and asked why Petitioner shot him. (*Id.*) Petitioner stated he responded that Green was lucky Petitioner only had a single bullet in the gun because, if he had more, he would have shot Green all over his body. (H: Duffy 19-20.) He also told Green that he was going to cut Green's head off and light Green on fire. (H: Duffy 20.) At that point, according to Petitioner, Green started to go into the studio. (*Id.*) Petitioner thought that Green was going to get another gun, but he fell on a chair inside the studio. (*Id.*) Petitioner then explained to Duffy that he left the studio to gather his belongings,

and called his girlfriend and friends to help him move his things. (*Id.*) Petitioner said that in the days afterward, he moved into different houses, getting help from people and finding places to sleep. (H: Duffy 20-21.) Petitioner said that, one day, he was walking around Crown Heights, Brooklyn, when he made contact with one of "them," and knew the person was evil and was going to "tell the others." (H: Duffy 21.) At that point, Petitioner explained, he took a bus and travelled to Florida. (*Id.*) Petitioner then asked Duffy, if Petitioner had to go back to Brooklyn, whether he will have to see "them" again. (*Id.*)

Duffy testified that it took approximately 45 minutes to an hour for Petitioner to give his statement. (H: Duffy 22.) After Petitioner finished his statement, Duffy asked him if he would be willing to be interviewed on videotape. (H: Duffy 22-23.) Petitioner responded that he thought he was already being videotaped, and Duffy explained that he would not videotape Petitioner without his permission. (H: Duffy 23.) Petitioner then agreed to be videotaped. (*Id.*) Once the recorder was on, Duffy told Petitioner that he had the right to remain silent. (Barall Aff. Ex. 4.) Petitioner said, "I have the right to do that? So why would you be asking me any questions if I have the right to do that?" (*Id.*) After Duffy explained that it was Petitioner's right and it was up to him to decide whether to waive the right, Petitioner asked what would happen if he decided not to answer Duffy's questions. (*Id.*) Duffy said that, if Petitioner decided not to answer his questions, "then I won't ask you anymore questions. Then that'll be it and we will shut it down." (*Id.*) Petitioner asked "what happens from there?" (*Id.*) Duffy explained, "It's up to you. Are you going to come back with us or are you going to stay here and we'll have to go back and do what we got to do and we'll come back and get you at another time." (*Id.*)

Duffy then told Petitioner that he was going to read the *Miranda* rights from the paper he had in front of him and if "you say no, if you don't want to answer my questions . . . that's it, it's

over. I don't question you any more, okay?" (*Id.*) Petitioner then asked, "when you meet up with me again and I'm still not answering your questions, then what?" (*Id.*) Duffy responded by explaining that Petitioner could either travel back to Brooklyn with him or stay in Florida until Duffy completed the necessary paperwork. (*Id.*)

Duffy again read Petitioner his *Miranda* rights from the card. (H: Duffy 23.) After each right, Duffy asked Petitioner if he understood, to which Petitioner responded yes. (Barall Aff. Ex. 4.) When Duffy told Petitioner that he had a right to a free attorney if he could not afford one, Petitioner said "you mean like today?" (*Id.*) Duffy responded, "Whenever. If you can't afford an attorney, they'll pay for one for you, that's what I explained to you earlier." (*Id.*) Duffy then repeated that Petitioner had a right to a free attorney and Petitioner responded that he understood. (*Id.*) Duffy asked Petitioner whether he was willing to answer questions after being advised of his rights. (*Id.*) Petitioner said, "Yes." (*Id.*) Duffy then removed Petitioner's handcuffs and they both signed the paper containing the Miranda card from which Duffy was reading. (H: Duffy 23-24.) As Petitioner's handcuffs were being removed, he mumbled something unintelligibly and then said, "we be chillin'." (Barall Aff. Ex. 4.)

Duffy then asked Petitioner to describe the incident that occurred on May 16, 2003. (*Id.*) Petitioner again explained that Green confronted Petitioner outside of the music studio about his failure to pay rent, which escalated into an argument. (*Id.*) Petitioner said that Green got upset when Petitioner said, "What if I expose you for things I know you do? For the secrets I keep for you? S--t I know you do. S--t I know you did. That'll bury all y'all." (*Id.*) Petitioner again stated that Green proceeded to grab Petitioner around the neck and laugh. (*Id.*) According to Petitioner, he was unable to fight Green off, so he pulled out the gun in his waistband and shot Green once in the stomach. (*Id.*) Petitioner said that, after being shot, Green went into the next

room and fell to his knees. (*Id.*) Petitioner then explained that he called DeWindt and Prescod who, along with McKay, helped Petitioner move his belongings out of his apartment. (*Id.*)

After Petitioner finished describing the shooting and its aftermath, Duffy asked Petitioner if he would be willing to come back to Brooklyn with Duffy. (*Id.*) Petitioner answered: "Depends. Those same people . . . I don't want them near me. I'm in cuffs now . . . it doesn't feel like I'm protected in cuffs . . . . It's a lot of them. A lot of them you don't know. They [are] invisible. I know how they operate. I know their secrets." (*Id.*) Petitioner then agreed to go back to Brooklyn with Duffy, if he could protect Petitioner from those people. (*Id.*) Then, the interrogation ended. (*Id.*)

### C.  Procedural Background

#### (i)  Suppression Hearing

Prior to trial, Petitioner moved to suppress the statements he made to Duffy during the May 2, 2004, interview in Boca Raton. A suppression hearing was held by the trial court on April 4, 2005, and October 12, 2005. During the hearing, Duffy first related Petitioner's statements, as described above, before the videotape was turned on. (H: Duffy 10-22.) To refresh his recollection, Duffy consulted notes he took during the initial interview, which he estimated encompassed approximately 90% of what Petitioner said, but was not a word for word account of Petitioner's statement. (H: Duffy 22, 31-32, 40-41.)

Duffy testified that Petitioner's statement that he did not have a name because he answered to a "higher power" made Duffy question whether Petitioner's "mental being" was "all there." (H: Duffy 31, 44.) However, Duffy testified that, as the interview went along, Petitioner spoke like a "regular guy" and appeared to understand the *Miranda* warnings. (H: Duffy 45-46.)

The prosecution also admitted into evidence the *Miranda* card signed by Petitioner and Petitioner's videotaped confession, which was played for the court. (H: Duffy 24-27.)

During defense counsel's cross-examination of Duffy, Petitioner began hyperventilating. (H: Duffy 33.) When the court asked Petitioner's attorney to check on Petitioner, Petitioner made several outbursts. (H: Duffy 33-34.) Petitioner said, "I don't care who he is, all of them, if I could just kill every one of them. . . . It was all of them, we was all in there at the same time, kill all of them. You don't understand." (*Id.*) Petitioner was then removed from the courtroom and the suppression hearing was suspended. (H: Duffy 34.) Petitioner was later found unfit to stand trial. (Barall Aff. Ex. 2 at 11; H: 49.)

In July 2005, Petitioner was found fit to proceed. (H: 49.) The suppression hearing continued on October 12, 2005, and Petitioner's attorney finished his cross-examination of Duffy. (Barall Aff. Ex. 2 at 11; H: Duffy 37.) After Duffy's testimony concluded, the prosecution rested and Petitioner did not call any witnesses. (H: 48.) Petitioner's attorney argued that the prosecution had not met its burden of showing that Petitioner was not mentally ill when he gave his statements to Duffy (particularly given Petitioner's odd statements during the interrogation and his outbursts at the suppression hearing) and, thus, had not shown that Petitioner understood his *Miranda* rights. (H: 48-51, 54-55.) The prosecution argued that the evidence showed that Petitioner freely and voluntarily waived his *Miranda* rights before giving his statements to Duffy. (H: 51-53.)

At the conclusion of the suppression hearing, the trial court orally denied Petitioner's motion to suppress his statements to Duffy. (H: 55-59.) The trial court held that, while Petitioner expressed some "strange notions" when he was interviewed by Duffy and had some problems recalling the nature of his rights the second time Duffy read them, the evidence

established beyond a reasonable doubt that Petitioner was "in sufficient possession of his faculties to understand the rights when they were stated to him on each occasion. And to knowingly, and voluntarily waive them." (H: 58.)

### (ii) The Trial

Petitioner's jury trial began on October 19, 2005. During the trial, the prosecution called as witnesses Green's brother (Milton Green), Petitioner's girlfriend (DeWindt) and witnesses who frequented the victim's studio, including Petitioner's friends (Downie, McKay, Richards and Prescod). The witnesses described Petitioner's conduct before and after Green was killed, including Petitioner's discussions with McKay about killing Green the night before Green's murder. *See supra* § I.A. DeWindt, McKay and Prescod also testified that Petitioner told them he shot Green, and described how they helped Petitioner hastily move out of his apartment after the shooting. *See id.* Downie and Richards testified about how they found Green's body in the room next to the studio, which was the same area that Petitioner earlier had blocked Downie from entering by threatening him with a gun. *See id.*

The prosecution also called as witnesses the people who investigated Green's murder. Dr. Frede Frederic, the prosecution's forensic pathology expert, testified that, according to the autopsy report, Green had a single gunshot wound to the abdomen and abrasions to his face and right wrist. (Frederic 543-44, 547.) Frederic also testified that the gunshot wound went through Green's liver, small bowel and the inferior venial cava, which is one of the major blood vessels in the body, causing Green to bleed to death a few minutes after he was shot. (Frederic 548-51.) Frederic testified that soot found on Green's t-shirt and powder stippling found on his body around the wound indicated that Green had been shot from a distance of approximately six to twelve inches. (Frederic 555-56.)

Duffy also testified, describing his investigation and how, after talking with witnesses, he settled on Petitioner as a suspect.  *See supra* § I.A.  Duffy testified that he located Petitioner after he was featured on an episode of "America's Most Wanted," and travelled to Florida to interview Petitioner.  *See id*.  Duffy also repeated the testimony he gave during the suppression hearing, describing his May 2, 2004 interview with Petitioner and Petitioner's confession to killing Green.  (Duffy 387-403.)  The videotaped portion of Duffy's interview with Petitioner was then introduced into evidence and played for the jury.  (Duffy 403-05.)

Petitioner did not present any witnesses.  (609.)  The trial court submitted second degree murder and second degree weapon possession counts to the jury, and charged the jury on self-defense.  (659, 670-82.)  The trial court also explained to the jury that it should not give any weight to Petitioner's statements to Duffy unless the jury determines beyond a reasonable doubt that Petitioner's statements were made voluntarily and were truthful.  (664-670.)

On October 27, 2005, the jury found Petitioner guilty of both murder in the second degree and criminal possession of a weapon in the second degree.  (719.)  On November 16, 2005, the trial court sentenced Petitioner to concurrent terms of imprisonment of 25 years to life on the murder count and 15 years on the weapon possession count, followed by five years of post-release supervision.  (Sentencing Tr. 16.)

### (iii)    Appeal

Petitioner appealed his conviction and sentence, asserting that his *Miranda* waivers at his interview with Duffy were not made knowingly, intelligently and voluntarily and his sentence was harsh and excessive in light of Petitioner's mental health issues.  (*See* Barall Aff. Ex. 2 at 2.)  On January 22, 2008, the New York State Appellate Division, Second Department, affirmed the trial court's decision not to suppress Petitioner's statements to Duffy and Petitioner's sentence.

*See People v. Boyce*, 47 A.D.3d 826 (2d Dep't 2008). The Appellate Division held that Petitioner's contention that his waiver of his *Miranda* rights was involuntary had "no merit" and that his sentence was not excessive. *Id.* at 826. On March 27, 2008, Petitioner's application for leave to appeal to the New York State Court of Appeals was denied. *See People v. Boyce*, 10 N.Y.3d 808 (2008) (Graffeo, J.).

### (iv) Post-appeal Proceedings

On June 18, 2009, Petitioner moved *pro se* in the New York State Supreme Court, Kings County to vacate his judgment of conviction pursuant to New York Criminal Procedural Law § 440.10. (Barall Aff. ¶ 14.) Petitioner contended that he was deprived of effective assistance of counsel, the prosecution's witnesses against him were coerced into testifying falsely against him, threats were used in order to obtain inculpatory statements from Petitioner, the prosecution presented perjured testimony at trial and the prosecution withheld *Brady* and *Rosario* material from him. (*Id*.) The prosecution opposed Petitioner's motion. (*Id.* ¶ 15.)

Petitioner filed this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on June 24, 2009, claiming that: (1) the prosecution failed to prove that he knowingly, intelligently and voluntarily waived his *Miranda* rights when he made certain inculpatory statements to police officers and (2) his sentence was harsh and excessive. (*See* Pet. for Writ of Habeas Corpus, Dkt. Entry 1, ("Pet.") at 1.)

On November 6, 2009, Petitioner moved to stay this action so that he could exhaust his New York Criminal Procedural Law § 440.10 claims and an ineffective assistance of counsel claim in state court, which Petitioner said that he intended to file shortly. (*See* Notice of Mot. for Stay & Abeyance, Dkt. Entry 7.) By electronic order on November 16, 2009, this court granted Petitioner's motion pending the exhaustion of his state remedies and directed Petitioner to notify

the court as to the outcome of the state court proceedings within thirty days of the final state court order.  On March 1, 2011, because the court had not received any update on Petitioner's state court proceedings, the court directed both Petitioner and Respondent to provide a status report as to Petitioner's exhaustion of state court remedies within 30 days.  By letter dated March 25, 2011, Respondent informed the court that Petitioner's motion to vacate his conviction was denied on October 23, 2009, and his application for leave to appeal from the denial of his motion was denied by the Appellate Division on May 6, 2010.  (*See* Letter from Resp't, Mar. 25, 2011, Dkt. Entry 8, at 1.)  The Respondent also informed the court that Petitioner had not yet filed a motion for a writ of error *coram nobis* based on an ineffective assistance of counsel claim.  (*Id.*)

On March 28, 2011, the court lifted the stay because Petitioner had not availed himself of the opportunity to file a writ of error *coram nobis* in the approximately year and a half since the stay was entered.  By Letter dated March 27, 2011, but not received by the court until March 30, 2011, Petitioner informed the court that he was finalizing his motion for writ of error *coram nobis* and needed more time to exhaust his state remedies.  (Letter from Pet'r, Mar. 27, 2011, Dkt. Entry 9, at 1.)  On April 28, 2011, the court again denied Petitioner's request for a stay because he did not explain why he delayed filing his state court writ.  Accordingly, the court now reviews Petitioner's request for a writ of habeas corpus and, for the reasons discussed below, denies the petition in its entirety.

## II.    LEGAL STANDARD

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") narrowed the scope of federal habeas review of state convictions when the state courts have adjudicated a Petitioner's federal claims on the merits.  Under the AEDPA standard, which governs the review

of petitions challenging state convictions entered after 1996, federal courts may grant habeas relief only if the state court's adjudication on the merits:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A decision is "contrary to" federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). An "unreasonable determination" is one in which "the state court identifie[d] the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applie[d] that principle to the facts of the prisoner's case." *Id.* A federal court may not grant relief "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the state court's application must have been "objectively unreasonable." *Id.* at 409. "[A] determination of a factual issue made by a State court shall be presumed to be correct," and "[t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

The court is mindful that *pro se* submissions, "however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Therefore, the court interprets the petition "to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F. 3d 471, 474 (2d Cir. 2006).

# III.   DISCUSSION

## A.   Knowing and Voluntary Waiver of *Miranda* Rights

Petitioner asserts that the prosecution failed to prove that he "knowingly, intelligently and voluntarily waived his *Miranda* rights when he was behaving in an irrational manner and did not appear to be mentally stable to the interviewing officer and on videotape." (Pet. ¶ 9.) Petitioner presumably argues, as he did to the Appellate Division, that strange statements Petitioner made before and during his interrogation, as well as his purported inability to remember his rights an hour after they were initially read to him, shows that Petitioner could not have intelligently waived his *Miranda* rights. (*See* Barall Aff. Ex. 2 at 24-30.) Thus, Petitioner apparently asserts that the state court should have suppressed his inculpatory statements to Duffy. Respondent contends that the videotape and Duffy's testimony provided a reasonable basis for the state court to conclude that Petitioner understood each of his *Miranda* rights before he waived them. (Resp't Mem. of Law, Dkt. Entry 3, at 34-38.)

Petitioner's claim that his post-arrest statements to the police should have been suppressed was presented to the Appellate Division which rejected the claim on the merits. *See Boyce*, 47 A.D.3d at 826. As Respondent asserts, Petitioner's suppression claim therefore is exhausted and may be reviewed by this court. *See Fama v. Comm'r of Corr. Servs.*, 235 F. 3d 804, 808-09 (2d Cir. 2000).

Under the landmark decision *Miranda v. Arizona*, 384 U.S. 436 (1966), and its progeny, a defendant may waive his constitutional rights "provided the waiver is made voluntarily, knowingly and intelligently." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). Thus, "[t]o prove a valid waiver, the government must show (1) that the relinquishment of the defendant's rights was voluntary, and (2) that the defendant had a full awareness of the right being waived and of the

consequences of waiving that right." *United States v. Jaswal*, 47 F. 3d 539, 542 (2d Cir. 1995) (per curiam). "Only if the totality of the circumstances reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *United States v. Male Juvenile*, 121 F. 3d 34, 40 (2d Cir. 1997) (quotation marks omitted). The Second Circuit has instructed that "[w]hether a waiver is 'knowing and voluntary' is a question directed to a defendant's state of mind, which can be inferred from his actions and statements." *United States v. Spencer*, 995 F. 2d 10, 11 (2d Cir. 1993) (per curiam).

Here, the trial court's decision that Petitioner knowingly waived his *Miranda* rights is not contrary to federal law or based on an unreasonable application of the facts. Duffy's description of the first half of the interview and the videotape of the second portion of the interview support a reasonable conclusion that Petitioner understood the situation he was in and the rights he was waiving. Petitioner was read his *Miranda* rights twice and both times he affirmed that he understood those rights. (H: Duffy 14, 23-24; Barall Aff. Ex. 4.) The second time Duffy read the rights Petitioner signed the card from which Duffy was reading. (H: Duffy 23-24.); *see Toste v. Lopes*, 861 F. 2d 782, 783 (2d Cir. 1988) (per curiam) (Waiver valid despite defendant's low intelligence where he was warned of his rights twice and waived those rights orally and in writing).

While Duffy testified that he initially questioned whether Petitioner's "mental being" was "all there" after Petitioner mentioned that he answered only to a "higher power" (H: Duffy 31), Duffy explained that, as the interview progressed, Petitioner spoke like a "regular guy" and appeared to understand what Duffy said. (H: Duffy 45-46.) Petitioner never expressed any confusion about his *Miranda* rights and, indeed, asked Duffy cogent questions about the import of those rights. During the videotaped portion of the interview, Petitioner probed the

consequences of refusing to answer Duffy's questions and asked about his right to a free attorney, if he could not afford one. (*See* Barall Aff. Ex. 4.) Once Duffy answered Petitioner's questions, Petitioner said that he understood his rights and that he would answer Duffy's questions. (*Id*.)

Petitioner also appeared to be coherent after he waived his *Miranda* rights. Twice, he told Duffy the story of how he killed Green in a manner that was logical and consistent, both with his two descriptions and with other witnesses' testimony. For example, Petitioner's description of shooting Green once in the abdomen from close range was consistent with the findings of the prosecution's medical expert. (*See* Frederic 555-56.) Petitioner also told Duffy that, after he shot Green, Green went into the engineering room and knelt on the floor, which matches Downie's and Richards's description of how they found Green's body. (Downie 318-20; Richards 350-52.)

Moreover, the statements that Petitioner previously described as strange do not show that he failed to understand his *Miranda* rights. Petitioner's claims that he: (1) only answered to a higher power; and (2) could tell that certain people were evil and that people had certain "secrets," do not render his waiver ineffective, even assuming the statements indicated that Petitioner was mentally ill. The law is clear that "[a] waiver of the right to remain silent is not invalid merely because a defendant is of limited mental capacity." *Toste*, 861 F. 2d at 783; *see also Male Juvenile*, 121 F. 3d at 41 ("[W]hile this evidence, as with the other evidence, may show defendant had some mental disabilities, the addition of this evidence of misunderstanding is insufficient to show that defendant could not knowingly waive his rights."); *Lawrence v. Artuz*, 91 F. Supp. 2d 528, 537 (E.D.N.Y. 2000) ("While the evidence may have supported a finding that defendant had learning disabilities, nothing in the record indicated that defendant

could not comprehend the rights that were explained and read to him." (quotation marks omitted)). Petitioner did not put forth any evidence, such as expert testimony, either at the suppression hearing or at the trial, to support his claim that the purported mental instability that allegedly caused Petitioner to make odd statements also rendered him incapable of understanding and waiving his *Miranda* rights. Similarly, Petitioner failed to provide evidence showing that his outbursts during the suppression hearing or the subsequent determination that he was unfit to stand trial for a few months impacted his ability to understand his *Miranda* rights approximately one year before the suppression hearing. Moreover, it is at least reasonable to infer that Petitioner's questions about his rights the second time Duffy read them does not indicate that he did not understand his rights the first time Duffy read them. Rather, Petitioner's questions appear to show that he was appropriately curious about his rights and felt comfortable asking questions until he was satisfied that he understood his rights. In any event, under the totality of the circumstances, any initial confusion Petitioner expressed about his right to remain silent or his right to an attorney is not enough to show that the trial court unreasonably concluded that Petitioner's waiver was voluntarily, knowingly and intelligently made.

To the extent that Petitioner still presses his claim that his waiver was not intelligently made because Duffy failed to provide adequate answers to Petitioner's questions, this claim is meritless. Duffy commendably assured Petitioner multiple times during the videotaped portion of the interview that, if Petitioner refused to answer Duffy's questions, the interview would end. (*See* Barall Aff. Ex. 4.) Duffy also accurately told Petitioner that he was entitled to an attorney "whenever" in response to Petitioner's question as to whether he could have a lawyer that same day. (*Id*.) These responses adequately conveyed the nature of Petitioner's rights. *See Moran*, 475 U.S. at 422 ("[W]e have never read the Constitution to require that the police supply a

suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights.").

Thus, the trial court's determination that, based upon the totality of the circumstances, Petitioner knowingly, intelligently and voluntarily waived his *Miranda* rights was not objectively unreasonable or contrary to federal law.[2]

## B.  Excessive Sentence Claim

Petitioner contends that, "[u]nder the circumstances of this case, sentencing [Petitioner] who had obvious mental issues to 25 years to life was harsh and excessive."  (Pet. ¶ 9.)  This claim lacks merit.  Federal courts reviewing state sentences through habeas petitions "should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes, as well as to the discretion that trial courts possess in sentencing convicted criminals."  *Solem v. Helm*, 463 U.S. 277, 290 (1983).  It is well settled that "[n]o federal constitutional issue is presented where, as here, the sentence is within the range prescribed by state law."  *White v. Keane*, 969 F. 2d 1381, 1383 (2d Cir. 1992); *Thomas v. Senkowski*, 968 F. Supp. 953, 956 (S.D.N.Y. 1997) ("It is well established that, when a sentence falls within the range prescribed by state law, the length of the sentence may not be raised as grounds for federal habeas relief.").

Petitioner was convicted of murder in the second degree, which is a class A-I felony under New York law.  *See* N.Y. Penal Law § 125.25 (McKinney 2012).  A class A-I felony carries a minimum imprisonment term of not less than 15 years and not more than 25 years, and a maximum term of life imprisonment.  *See* N.Y. Penal Law § 70.00(2)(a), 3(a)(i) (McKinney

---

[2] Because the court holds that the trial court's denial of Petitioner's suppression motion was not unreasonable, the court need not address Respondent's alternative argument that any error was harmless.

2012). Petitioner was sentenced to 25 years to life imprisonment on his conviction for murder in the second degree. (*See* Sentencing Tr. 16.) Petitioner also was convicted of criminal possession of a weapon in the second degree, for which he was sentenced to 15 years in prison. (*See id*.) Pursuant to New York law, this conviction carries a three and a half to 15-year prison sentence. *See* N.Y. Penal Law § 70.02(1)(b), (3)(b) (McKinney 2012). Thus, Petitioner's sentences on both charges were within the ranges prescribed by state law.

Moreover, Petitioner's sentence does not violate the Eight Amendment to the United States Constitution, which bars "cruel and unusual" punishment. In determining whether a sentence for a term of years violates the Eight Amendment, the Supreme Court has adopted a "gross disproportionality principle." *Lockyer v. Andrade*, 538 U.S. 63, 72 (2003). Petitioner was convicted of intentionally shooting and killing another person, and his total sentence of 25 years to life is not grossly disproportionate to those acts. Petitioner's purported "obvious mental issues" do not make this sentence cruel and unusual. There is nothing in the record demonstrating that any mental illness Petitioner had rendered him less culpable for his crimes or caused a typical penalty for intentional murder to become otherwise beyond the pale.

Accordingly, Petitioner's request for habeas relief based upon the alleged excessiveness of his sentence is denied.

### III.    CONCLUSION

For the reasons set forth above, Petitioner's request for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied.  Petitioner is denied a certificate of appealability, as he has failed to make a "substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2); *see* Fed. R. App. P. 22(b); *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003); *Luciadore v. New York State Div. of Parole*, 209 F. 3d 107, 112 (2d Cir. 2000).  The court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith, and, therefore, *in forma pauperis* status is denied for purpose of an appeal.  *Coppedge v. United States*, 369 U.S. 438, 444–45 (1962).


SO ORDERED.

Dated:  Brooklyn, New York
         August 29, 2012

                              _____/s/_____
                                   DORA L. IRIZARRY
                                   United States District Judge